IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | |
|---|---|
| YVONNE AYALA, CLAUDIA DAVILA, BELINDA GARCIA, AYDEE LOYA, LLOYD LOYA, RAMIRO LOYA, LUIGI MENDOZA, DAVID NACIANCENO, LANDO NACIANCENO, JOSE LUIS PEREZ, RAMON PORTILLO, CESAR RODRIGUEZ, JOE VILLARREAL and RICARDO VILLARREAL §§§§§§§§§ | CIVIL ACTION NO. _____ |
| *Plaintiffs* §§ | |
| VS. §§ | |
| La Joya Independent School District, La Joya Independent School District Former Board Trustees Alex Cantu, Nereyda Cantu, Dr. Alda Benavides, Esmeralda Solia and Anthony Uresti, in their individual and official capacity, La Joya Independent School District Former Superintendent, Dr. Gisela Saenz, in her official capacity, La Joya Independent School District Former Superintendent, Heriberto Gonzalez, in his Individual and official capacity, La Joya Independent School District Superintendent Dr. Sorenson and her successors, in their official capacity §§§§§§§§§§§§§§§ | |
| *Defendants* § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COME** Plaintiffs, complaining of and about La Joya Independent School District, La Joya Independent School District former Board Member Trustee Alex Cantu, individually and in his official capacity, La Joya Independent School District former Board Member Trustee, Nereyda Cantu, individually and in her official capacity, La Joya Independent School District former Board

Member Trustee, Dr. Alda Benavides, individually and in her official capacity, La Joya Independent School District former Board Member Trustee, Esmeralda Solis, individually and in her official capacity, La Joya Independent School District former Superintendent Dr. Saenz, in her official capacity, La Joya Independent School District former Superintendent Heriberto Gonzalez, individually and in his official capacity, La Joya Independent School District Superintendent Dr. Sorenson and her successors, in their official capacity and for causes of action show unto the Court the following:

## I.    PARTIES

1.    **YVONNE AYALA**, (hereinafter referred to as "**YVONNE**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

2.    **CLAUDIA DAVILA**, (hereinafter referred to as "**CLAUDIA**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

3.    **BELINDA GARCIA**, (hereinafter referred to as "**BELINDA**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas

4.    **AYDEE LOYA**, (hereinafter referred to as "**AYDEE**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

5.    **LLOYD LOYA**, (hereinafter referred to as "**LLOYD**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas

6.    **RAMIRO LOYA**, (hereinafter referred to as "**RAMIRO**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas

7.    **LUIGI MENDOZA**, (hereinafter referred to as "**LUIGI**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas

8.      **DAVID NACIANCENO**, (hereinafter referred to as "**DAVID**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas

9.      **LANDO NACIANCENO**, (hereinafter referred to as "**LANDO**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

10.     **JOSE LUIS PEREZ**, (hereinafter referred to as "**JOSE LUIS**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

11.     **CESAR RODRIGUEZ**, (hereinafter referred to as "**CESAR**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

12.     **JOE VILLAREAL**, (hereinafter referred to as "**JOE**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

13.     **RICARDO VILLARREAL**, (hereinafter referred to as "**RICARDO**"), is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

14.     Defendant **LA JOYA INDEPENDENT SCHOOL DISTRICT**, (hereinafter "**LJISD**") is a political subdivision of the State of Texas, with its executive office located at 200 W. Expressway 83, La Joya, Tx 78560.

15.     Defendant **DR. GISELA SAENZ**, LJISD's former Superintendent, (hereinafter "**DR. SAENZ**"), in her official capacity, is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

16.     Defendant **HERIBERTO GONZALEZ**, LJISD's former Superintendent, (hereinafter "**H. GONZALEZ**"), individually and in his official capacity, is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

17.     Defendant **DR. MARCEY SORENSON**, LJISD's Superintendent, (hereinafter "**DR. SORENSON**") and her successors, in her official capacity, is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

18.     Defendant, former La Joya Independent School District Board Member Trustee, **ALEX CANTU**, (hereinafter "**A. CANTU**"), individually and in his official capacity, is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

19.     Defendant, former La Joya Independent School District Board Member Trustee, **NEREYDA CANTU**, (hereinafter "**N. CANTU**"), individually and in her official capacity, is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

20.     Defendant, former La Joya Independent School District Board Member Trustee, **ESMERALDA SOLIS**, (hereinafter "**E. SOLIS**"), individually and in her official capacity, is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

21.     Defendant, former La Joya Independent School District Board Member Trustee, **ANTHONY URESTI** (hereinafter "**A. URESTI**"), individually and in his official capacity, is an individual and a citizen of the State of Texas, and resides in Hidalgo County, Texas.

## II.     JURISDICTION AND VENUE

22.     The subject matter in controversy is within the minimal jurisdictional limits of this Court.

23.     Jurisdiction over Plaintiff's constitutional claim for redress is provided by U.S.C. Title 42 §1983 and conferred on the court by 28 U.S.C. § 1343 (a) (3.).

24.     Federal question jurisdiction is also conferred under 28 USC §1331, because this action arises under the constitution and laws of the United States.

25.     This Court has supplemental jurisdiction over state law claims discussed below under 28 U.S.C. Section 1367(a) because they arise out of the same operative facts, case or controversy.

26.     Venue is proper in this district under 28 U.S.C. §1391(b), because LJISD resides in Texas and the events complained of occurred in Hidalgo County, Texas.

### III.     NATURE OF ACTION

27.     Plaintiffs' commence this action pursuant to 42 USC §1983, which provides in relevant part for redress for every person within the jurisdiction of the United States for the deprivation, under color of state law, of any rights, privileges, or immunities secured by the United States Constitution and laws.  Specifically, Defendants violated Plaintiffs' freedom of speech and affiliation, freedom of retaliation from Plaintiff's freedom of speech and affiliation and life and liberty interests, all guaranteed to Plaintiffs by the first (1st) amendment right and fourteenth (14th) amendment right of the United States Constitution.  Plaintiffs are seeking recovery and redress for the serious infringements inflicted up them, pursuant to 42 U.S.C. §1983 and §1988.  Plaintiffs are specifically seeking damages related to mental anguish, emotional distress, physical ailments and financial loss caused by **LJISD** from their actions and inactions, such as failure to train, failure to supervise, infringement upon Plaintiffs freedom of speech and substantive and procedural due process, under the color of law, with the intent and purpose of depriving said Plaintiffs of rights secured under the Constitution and laws of the United States.

### IV.  PRELIMINARY STATEMENT

28.     The lawsuit arises under Federal Statutes including 42 U.S.C. §1983.  As set forth in paragraphs below, during the times and on the occasions described below and herein, people who worked for or were engaged by LJISD conspired to deprive Plaintiffs of their respective

constitutional and legal rights under the First and Fourteenth Amendments to the U.S. Constitution in violation of 42 U.S.C. §1983. LJISD and the individuals aforementioned, in their official and/or individual capacities, performed numerous and various overt acts, as described below and herein, in furtherance of these violations and conspiratorial acts against Plaintiffs. Each Defendant had actual knowledge of the unconstitutional nature of its/their acts. Defendants, specifically LJISD's Board of Trustee members named in this suit, made it known throughout LJISD and to Plaintiffs themselves, that the injury and harm suffered by Plaintiffs, were due to Plaintiffs' affiliation with a political faction, opposing Defendants and their allegiance to their political party. Defendants, especially named LJISD's Board of Trustee members as Defendants, obtained actual or constructive knowledge of the unconstitutional acts by virtue of Defendants' direct involvement of these illicit acts, Plaintiffs' grievances, which lasted over two (2) years, Plaintiffs' respective verbal complaints directly to LJISD's Board of Trustee members, Defendants involvement with the TEA investigation and LJISD's acceptance and ratification of TEA's investigative results, the hearings Plaintiffs continually lodged against LJISD and the Board of Trustee members, and their customary practice and pattern in violating rights, such as the rights of Plaintiffs. Additionally, knowing LJISD was violating certain Plaintiffs' rights, it accepted and approved forced resignations, due to the constructive discharge forced upon these individuals, via a bogus policy it randomly conjured up. This deprivation alone not only affected the rights of an elected official, but those of the voters who exercised their right to vote for this elected official, to represent them, the constituents, as *their elected official*.

## V. FACTS

**<u>Introductory Facts and Defendants' violations of Plaintiffs' constitutional rights and violations of situated state law</u>**

29.     **LJISD** is located in Hidalgo County, Texas and includes the cities of La Joya, Palmview, Peñitas and Sullivan City.

30.     Plaintiff **RICARDO VILLARREAL** is the mayor of Palmview, Texas.

31.     Plaintiff **RAMIRO LOYA** is the mayor of Peñitas, Texas.

32.     Plaintiff **LLOYD LOYA** is **RAMIRO's** son.

33.     Plaintiff **AYDEE  LOYA** is **RAMIRO's** daughter-in-law.

34.     Plaintiff **YVONNE AYALA** is the niece of **RAMIRO** and the cousin to **LLOYD**.

35.     Plaintiff **JOSE LUIS PEREZ** was a former commissioner of Palmview, Texas, but he was forced to resign from his elected position by Defendant, **LJISD**, or forfeit his job at **LJISD** at the end of the 2023-2024 academic year.

36.     Plaintiff **BELINDA GARCIA** is a member of the Board of Commissioners for La Joya Federal Credit Union and has been for over fourteen (14) years.

37.     The political climate in Hidalgo County, Texas is contentious and has led to investigations by the FBI, local law enforcement and the Texas Education Agency (hereinafter "TEA").  It has also led to indictments, plea deals and jail sentences of former **LJISD** Board of Trustee Members, former employees and third parties, acting on behalf of Defendants.

38.     After the ongoing malfeasance and corrupt behavior by **LJISD**'s Board of Trustees, its employees and third parties, acting on behalf of **LJISD** or in conjunction with **LJISD**, TEA launched a formal investigation.  TEA interviewed **DEFENDANTS** between the end of the 2022 academic year through the end of January 2023 and finalized its investigation on or about May 9, 2023.   TEA recommended the removal of **DEFENDANT LJISD's SCHOOL BOARD TRUSTEE MEMBERS** and Superintendent **H. GONZALEZ.** The recommendation to remove

the Board of Trustee Members and its Superintendent came with opposition, but TEA was eventually successful in their cooperation in being removed.

39.    Defendants, individually and collectively opposed the political positions which Plaintiffs either had or supported.  Upon being placed in a position to act, Defendants retaliated against the Plaintiffs based upon their political affiliation.

40.    Under no circumstance is the political affiliation of any of the Plaintiffs a mandated or suitable requirement for effective performance of each respective Plaintiff's position, held prior to the retaliation by the Defendants.

41.    Each Plaintiff, of said petition, is a victim of political retaliation, denial of due process, a victim of the Texas Open Meetings Act, a victim of **LJISD**'s elected officials abuse of public office, and victims of **LJISD**'s conspiratorial acts against Plaintiffs.

42.    Each Plaintiff is either directly related to another Plaintiff, who is an elected official, *is or was* an elected official or blatantly made it known he or she did not support the board majority and the candidates they wanted elected.  It was made clear, by each Plaintiff, he or she was not going to allow any individual to impede his or her constitutional right as to their freedom of speech and affiliation of a political party.

43.    All Plaintiffs' rights were violated by Defendants, either in Defendants' official or individual capacity.  Defendant's violations were the direct cause of Plaintiffs' demotions, Plaintiffs' forced resignations or Defendants' flagrant words, acts and omissions to act, which led to Plaintiff's termination by **LJISD**.

44.    Each and every Plaintiff has suffered irreparable harm, including but not limited to, extreme financial crises, unemployment, defamation to his or her character and name, inability to perform duties, sworn under oath, as an elected official, mental anguish, sleep deprivation,

depression, physical harm and many other damages, all caused by Defendants and the corrupt behavior instituted by the District, its employees and elected officials.

***The Facts of the Claims Asserted by Each Plaintiff are Intertwined, and the Causes of Action Are Similar, if not Identical***

<u>***Plaintiff Yvonne Ayala***</u>

45.    **YVONNE** was employed with **LJISD** for over twenty-five (25) years.  She began as a teacher and moved up the ranks as a comprehensive highs school principal, which she served for nine (9) years.  From there, she moved up to Assistant Superintendent for Human Resources, and in January 2023, **DR. SAENZ** promoted her to Assistant Superintendent of Student Services. She was told by **DR. SAENZ** that her expertise was needed, due to her experience as a High School Principal, to aid the Student Services Department.  **YVONNE** found this comment suspicious, and given the climate and changes within **LJISD**, she became leery of her future within the District.

46.    It is important to note that **YVONNE** is the niece of **RAMIRO** and the cousin to **LLOYD**.  Additionally, she is very good friends with **LLOYD'S** wife, **AYDEE**.  Aside from these individuals, aforementioned, **YVONNE** has numerous other family members who work or have worked for **DEFENDANT LJISD** and who were affected by **DEFENDANT'S** retaliatory conduct.

47.    During this time, while **YVONNE** worked within the HR department, the FBI and TEA instructed **YVONNE** to collect and submit documentation they requested.  The documents she collected and handed over to each agency affected **LJISD and DEFENDANTS.  YVONNE'S** corroboration with state and federal authorities have aided authorities to make findings both **DEFENDANTS'** current and former board members, including current board president, **ALEX**. **DEFENDANTS** became aware of her cooperation and her refusal to join ranks with **DEFENDANTS.**

48.      In April 2023, **ALEX** had a conversation with **DR. SAENZ** and **ALEX**, at this time, gave her a list of employees.  He ***demanded*** she reassign or terminate each and every name on said list.  **DR. SAENZ** informed **YVONNE** of the instruction given to her ***and*** that **YVONNE'S** name ***was*** included on the list.

49.      **YVONNE** had been a Cabinet member within **LJISD** for some time, and was even praised by **H. GONZALEZ**, for her work in the cabinet and the job she did in her current position. Despite this, on June 1, 2023, while on a break during a cabinet meeting, **H. GONZALEZ** told **YVONNE** he needed to meet with her about an assignment for the next year.  He told her, "Do not worry.  I have safeguarded your pay."  That afternoon, at approximately 5:50 p.m., **MAGDA** called **YVONNE** to her office at HR for a meeting, which would include **H. GONZALEZ**.  At that meeting, **YVONNE** learned she was being reassigned to serve as Principal at a high school in the **LJISD**.  **YVONNE** expressed concern over the change in pay, which was a dramatic decrease and the fact she would be unable to sit on the cabinet she has dedicated so much time and talent for the benefit of **LJISD**.  **H. GONZALEZ** told her he would "pray on it," and at that point, **YVONNE** knew things were going to get worse for her than the drastic demotion she just endured. The following Monday, **YVONNE** met with **MAGDA** and learned she was being moved to and "Executive" position, but the letter tendered, did not state what **B. GONZALEZ** told her before. She was concerned this letter did not reflect that her pay would stay the same.

50.      **YVONNE** suffered a series of demotions after she filed her initial grievance and began to talk about the injustices, she and others incurred at **LJISD.**  On August 15, 2023, four (4) weeks of serving in her director position, **MAGDA** told **YVONNE**, it was "…in the best interest of the district" to serve as an Assistant Principal at La Joya High School.

51.    After this, **YVONNE'S** career spiraled downward, because of her familial and political affiliation.  Additionally, **LJISD** subjected **YVONNE** to more retaliation on behalf of **DEFENDANTS**, due to **YVONNE'S** cooperation with federal agents.  **YVONNE**, eventually and unjustly, was placed on administrative leave, and after reinstatement, she was non-renewed for no reason.  Fortunately, **YVONNE**  obtained employment, eventually, but she now makes more than half of what she made before **DEFENDANTS** political and retaliatory moves.

***Plaintiff Claudia Davila***

52.    **CLAUDIA** earned her college degree in guidance and counseling and her master's degree in educational leadership by 2003.  She began working at **LJISD** in 1998.  By 2013, **LJISD** Board of Trustees approved the recommendation for **CLAUDIA** to serve as the Human Resource coordinator, overseeing fourteen (14) campuses, the central office, staff curriculum and instruction, student services, administrative finance and the Superintendent's office.

53.    Prior to being demoted, **CLAUDIA** was also in charge of creating the job descriptions for positions which opened or new positions and signing up new hires.  She held this job duty until July 19, 2023, after **LJISD** and its Board of Trustees began its blatant retaliation against all individuals who did not support the Board Majority.

54.    After the political retaliation began against those who did not support the board majority, job descriptions were changed and jobs were taken away from highly qualified individuals, including each Plaintiff in this case.  **CLAUDIA**, being in the Human Resource department and being the most qualified employee with knowledge and experience in handling these matters, was excluded from her usual duties and responsibilities.

55.    **CLAUDIA** witnessed firsthand the overt acts of Defendant Trustees overt actions via the employees, who were allowed to keep their positions and who supported Defendant

Trustees.  Those who were good friends and/or supported the Board Majority or aligned themselves with the individuals in charge within **LJISD**, were given jobs they did not qualify to even apply for and definitely did not qualify to be recommended and hired upon the vote of the board majority. For instance, **NEREIDA's** good friend, Christina Flores, applied for the new coordinator position for cluster two (2).  She ***did not*** meet the criteria to even apply; yet there were at least ten (10) other individuals qualified to interview.  Magda Villarreal, (hereinafter "**MAGDA**"), the Human Resource Administrator, questioned **CLAUDIA** why Ms. Flores was not qualified and interviewed.  **CLAUDIA** explained she did not meet the job description criteria, due to not holding a principal certificate and not having the years of administrative experience.  **MAGDA** instructed **CLAUDIA** to change the job description.  **CLAUDIA** explained it was not permitted by TASB, the Texas Association of School Board, but she was forced to change the description, and **MAGDA** explained it was pursuant to the superintendent, via the Board majority.  **CLAUDIA** refused to sign off on it, but **MAGDA**, under the guise of the Superintendent via the Board majority, signed the form giving Ms. Flores the job and granting a salary not even recommended, on paper, which was approximately $92,000.00.

56.    **CLAUDIA** ostensibly made it plain and clear she was ***not*** in support of the **LJISD DEFENDANT MAJORITY BOARD OF TRUSTEE MEMBERS**' candidates.  She also made it clear she had zero intention of supporting them, although she was pressured by those within the **LJISD** Human Resource Office and by **LJISD DEFENDANT MAJORITY BOARD OF TRUSTEE MEMBERS**.  **CLAUDIA** attended political events of the opposing factor, was ***seen*** by Defendants at the opponents' events, in opposition to the party they wanted her to support, and she was unapologetic as to her said support.  Because **CLAUDIA** invoked her First (1st) and Fourteenth (14th) Amendment constitutional rights as to freedom of speech and right of association

by due process, in opposition to Defendants desire for her to support their candidates, **DEFENDANTS** disregarded her extensive knowledge, education and flawless record with **LJISD**. On July 19, 2023, **CLAUDIA** was demoted to assistant principal, despite the fact she had just received an evaluation, which exceeded expectations, the highest level attainable within a school district in Texas.

57. While **CLAUDIA** was still at the Human Resources Department at the Central Office, her job duties were diminished to essentially nothing She was stripped of handling any reassignments. Because of her political affiliation and opposition to the Board majority, she knew she was blacklisted within **LJISD**. Being blackballed, solely because she would neither engage in Defendants' retaliatory repositions nor vote and support Defendants' preferred candidates, **CLAUDIA** was demoted to Assistant Principal. This was a significant decrease in salary, prestige in title and rank, defamatory and annihilated any possibility of her ever attaining a position she would have eventually achieved, given her experience and education.

58. Her demotion occurred after **MAGDA** questioned **CLAUDIA** and the Human Resources accountant, Angel Canales, about **YVONNE'S** upward salary adjustment. **CLAUDIA**, along with Mr. Canales, explained the new salary, based on the new compensation plan, and they even called TASB, the Texas Association of School Boards, to confirm the new computation was done correctly. **MAGDA** stated to **CLAUDIA** that all the employees they calculated the salaries for were done wrong. She was specifically angry at **YVONNE**, **because YVONNE** had also been demoted from the Human Resources Office to an Assistant Principal at a school within **LJISD**.

59. Mr. Canales was so disgusted and disappointed in the blatant corruption occurring, after witnessing the relations, leading to the demotions or non-renewals of the most qualified individuals, all based off retaliation based on speech and political affiliation.

60.     It is important to note again that Ms. Ayala is the niece to Plaintiff **RAMIRO**, who is the mayor of Peñitas.

### *Plaintiff Belinda Garcia*

61.     **BELINDA** was non-renewed, shortly after **RICARDO**, but when she asked why she was not renewed, was told the reasons for her non-renewal were not allowed to be disclosed and this individual was given instructions to withhold all information regarding her non-renewal.

62.     **BELINDA** has served on the Board of Commissioners for La Joya Federal Credit Union for over fourteen (14).  During one Board meeting, while **LJISD** was terminating or non-renewing contracts to benefit itself, **BELINDA** questioned the sudden resignation of another board member, because it was never placed on the agenda.  Additionally, she questioned how another board member could arbitrarily suggest **LJISD Board of Trustee Member ALEX** as the next nominee, i.e. already decided upon board member, while he was still the President Board Member Trustee at **LJISD**.  Again, she reiterated this was not on the agenda and improper.  The current member, whose place **ALEX** would take over, had not resigned.  60.

63.     **BELINDA** was intentionally left out of all communication and discussion about his nomination and election, even though she attended via telephone and was at the meeting from the beginning.

### *Plaintiff Aydee Loya*

64.     On February 15, 2023, **AYDEE** was provided a letter titled "reassignment letter," which was signed by **DR. SAENZ**.  This letter was not a reassignment letter, but rather a demotion. **AYDEE** was demoted from her position within the Student Services Department, as a PEPP specialist, to a second grade elementary teacher at Seguin Elementary.

65. Over the last six years, her salary has steadily increased to approximately $80,000.00. She has held this position, without issue, and was in charge of Palmview High School and the Career Center.

66. **AYDEE'S** salary significantly decreased, effective in the 2023-2024 school year, which detrimentally affected her and her family's financial stability, her ability to progress within **LJISD** and it affected her character and reputation as an employee, due to the fact she is a "Loya".

67. There are two other women who also serve in the same position, but different locations than **AYDEE**. Jessica Ortega, a City Commissioner for Mission, who took over Palmview High School and Veronica Mendoza, a Mission ISD Board of Trustee Member who took over the Career Center.

68. All three positions were part of the attrition proposal; however, **AYDEE** was the only individual affected. **AYDEE** is the only one of those three who does ***not*** hold a political position. **AYDEE** *is* the only one who did not support the board majority and refused to be influenced by their threats.

69. **AYDEE** was moved to the northern part of the school district in Mission, and it now takes her twenty minutes, on a good day, to get to school. Prior to this, at her position as a PEPP specialist, she was only eight minutes away from her employment, give or take.

70. **DR. SAENZ** demoted **AYDEE**, although **AYDEE** had not been told about any problems in her department or her performance. This demotion is detrimental to **AYDEE'S** career, and she was thrown into this position without any guidance or acceptance by her new peers and supervisors and definitely did not receive any preparation from administration, specifically the **DR. SAENZ** and her staff, prior to her beginning her new position on January 20, 2023.

71.    **DR. SAENZ** conspired with the **LJISD'S BOARD OF TRUSTEE MEMBERS** and retaliated against **AYDEE**, in violation of her first amendment rights in supporting who she wanted to support as a board trustee member for **LJISD**.

72.    **DEFENDANT LJISD** awarded employees with a Christmas bonus for their own political gain by promising up to $5,000.00, when normally bonuses are $1,250.00.  They did this to ensure their win in the upcoming elections and to assure and guarantee that certain contracts in several departments were given to the companies they are affiliated with or those companies who support them. **DR. SAENZ** and **LJISD BOARD MAJORITY TRUSTEE MEMBERS**, used the City of La Joya's taxpayers hard earned tax dollars to promote their political agenda.  Their reckless spending of the school district's budget affects all taxpayers, parents, children, teachers, staff and the residents of La Joya. The **DEFENDANTS** used **AYDEE** as an example to others who are employed by **LJISD**, illustrating that they will also suffer the consequences if he or she do not follow these individuals' political motives.

73.    At that time, **AYDEE** knew and was acquainted with numerous employees at LJISD who performed subpar, had shoddy attendance and misconduct.  Because they were either aligned with **DEFENDANTS**, **LJISD** did not reassign, demote or fire one of those individuals. **ALEX** and the other board members instilled enough fear in employees, especially at this point when they were non-renewing, demoting, or terminating supporters of other factions right and left.

74.    **AYDEE**, who has numerous family members employed by **LJISD**, was informed by one of her family members, that the Loya's were going to be "taken down" by Board member **ALEX** and Board Member **NEREIDA** and the other three (3) board members, because they, along with **HERIBERTO**, had the power to get rid of all the Loya's in the district.  This was told to

**AYDEE**'s family member in an elevator in the administrative building, which was relayed immediately to the Loya family, already affected by Defendant's corrupt behavior.

75.    **LJISD** retaliated against **AYDEE**, because her father-in-law was running in a highly contentious race for his current elected seat as Mayor of Peñitas.  Defendants **LJISD**'s majority Board of Trustee Members supported Mr. Loya's opposing candidate, which is one of the main reasons the Loya family suffered irreparable harm.  All Plaintiffs, opposed to **LJISD**'s candidate to win this election, suffered LJISD's retaliation via demotions, non-renewals, maltreatment, etc.    Unfortunately, one political rally resulted in an assault by board member **ANTHONY URESTI**'s mother against Plaintiff **CESAR RODRIGUEZ**. Please reference the paragraph below, regarding **CESAR RODRIGUEZ**.

76.    Additionally, as aforementioned, please refer to the section pertaining to **LLOYD LOYA** and **RAMIRO LOYA**, because both play a role in the conspiratorial acts Defendants committed against this family.

*__Plaintiff Lloyd Loya__*

77.    On May 31, 2023, **LLOYD** received a letter from Human Resources, signed by **H. GONZALEZ**, which gave him notice of the non-renewal of his contract for the 2023-2024 academic year. At the time, **LLOYD** held the position of Energy Utility and Compliance Director.

78.    **LLOYD** was shocked to receive a non-renewal notice at the very end of this year, especially because his name had not been mentioned before in the board meetings or workshops. **PEPE** never evaluated **LLOYD** for the 2022-2023 academic year. As mentioned in this petition, **PEPE** took over **RICARDO'S** position and had zero experience in every aspect of said position. **PEPE** was repeatedly instructed to do **LLOYD'S** evaluation by Human Resources, but he refused to do it.  This is a requirement by State law, but **PEPE** was with the **DEFENDANT BOARD**

**MAJORITY TRUSTEE MEMBERS** and the rules and law did not apply to him. **LLOYD** never received a poor evaluation; each evaluation has been flawless. **LLOYD** never received any reprimands, write ups and **LJISD** commended **LLOYD** for saving **LJISD** millions of dollars, while serving in his position.

79.    **LLOYD** suffered **DEFENDANT'S** retaliation solely because of his familial affiliation to his father and the fact he was a Loya. Because of the highly contentious mayoral race his father, in Peñitas, where his father, **RAMIRO**, served as the incumbent mayor, **DEFENDANTS** did not like **LLOYD** and did not want him at **LJISD**. This was told to **LLOYD** by numerous individuals who were 'friends' of **ALEX** and the other **DEFENDANT** trustee members. These individuals continued to divulge information to **LLOYD** about **DEFENDANTS'** plans for him and his family, because they did not want to see further harm done to the Loya family. They were not able to ever pledge their allegiance to the Loya family, because they would also suffer retaliation by **DEFENDANTS.**

80.    **LLOYD** was blackballed by **LJISD** and unable to get employment anywhere, despite the numerous applications he submitted. Just recently, **LLOYD** finally got hired, but he is making half of what he made before.

### *Plaintiff Ramiro Loya*

81.    **RAMIRO** began employment with **LJISD** on November 6, 2004, as a Custodial Manager. He served as the sole custodial manager until 2016, when **LJISD** grew and necessitated extra help. **RAMIRO** never had issues with **LJISD** until **DEFENDANTS** became political and created a faction overseeing every election throughout the **LJISD**, which covered four (4) cities. Because of **RAMIRO'S** elected position as the Mayor of Peñitas, **DEFENDANTS** often pressured him to do them "favors," which he always refused and/or ignored. Because **RAMIRO** would not

appoint **ALEX** to a position within the town, specifically municipal judge, **DEFENDANTS BOARD OF TRUSTEE MEMBERS** retaliated against **RAMIRO**. **RAMIRO** has always worked from 8:00 am to 5:00 pm, throughout his entire tenure at **LJISD**, but **DEFENDANTS** changed his hours from 10:00 am to 7:00 pm. Not long after, on or about February 2023, **RAMIRO** was reassigned from Custodial Manager to Custodian, even though he had been the Custodial Manager for almost twenty (20) years. Given his age of seventy-three (73), **DEFENDANTS** knew he would not be able to last as a janitor at **LJISD**. **RAMIRO'S** salary was reduced by $26,000.00, and he was moved to work at the FFA Barn.

82.     **DEFENDANTS** want **RAMIRO** to give them positions or to give up his position as Mayor. Prior to becoming mayor in 2022, **RAMIRO** served as a councilman for eight (8) years. Because of his refusal to bow down to **DEFENDANTS'** insistent requests, which require **RAMIRO** to violate the law, **RAMIRO** felt like he was being forced to retire.

83.     The election for Mayor was May 6, 2023. **RAMIRO** is positive his demotion was due to this race and his refusal to back down. His opponent was Claudia Ochoa. **DEFENDANTS** hired her husband, Arnold Ochoa (hereinafter "OCHOA") after she lost the race. **H. GONZALEZ** gave personalized **OCHOA** tours of **LJISD'S** campuses, but **H. GONZALEZ** was already acquainted with **OCHOA,** because they are partners in a construction company, which of course has submitted bids to **LJISD** and other districts in Texas. Everardo Villarreal, a major political player in Hidalgo County, Texas, wants the control of Peñitas, and his wife was part of the TEA investigation against **LJISD**, but was prior to **DEFENDANTS** collaborating with him to take control. Ruth Villarreal, Everardo's wife, was a LJISD board member for five (5) years, but she was defeated by Alda Benavidez. **ALDA** was supported by the Loya family and many of the Plaintiffs, at that time.

84.     **LJISD** required **RAMIRO** to do grueling work, which was impossible, given his age.  **RAMIRO** suffered an accident in May and June of 2023, and went to worker's compensation. He injured himself throwing out trash, which was never-ending, and in June he clipped in the cafeteria on the waxed floors and injured his head, back and arm.  After this, **RAMIRO** had no choice but to retire.

85.     **RAMIRO** did not back down from running as Mayor, and he did win.  It pains him and has caused him distress that his children, daughter-in-law, friends, former comrades and employees he oversaw, were all affected due to their support of him, rather **DEFENDANT'S** candidate.

### *Plaintiff Luigi Mendoza*

86.     **LUIGI** worked for Halliburton as a fluid engineer for five (5) years. He was asked by the former Director for Facilities, Danny Garza, if he wanted to help the district out and apply as the Director for Facilities.  **LUIGI** applied for the job open in the department, which was now Assistant Director or Physical Plant Operations.  He oversaw fifteen (15) schools on maintenance, electrical and plumbing issues.

87.     **LUIGI** was in charge of the fifteen (15) schools in area three (3) and Plaintiff **JOE** was in charge of fifteen (15) schools in area two (w).

88.     On May 31, 2023, **LUIGI** was provided with a letter, signed by Interim Superintendent of Schools, **HUMBERTO**, informing him of the non-renewal of his contract for the 2023-2024 academic year. His contracts were "exceeds expectations," and the only thing he could think of, as to why he was being non-renewed, was because he did not support Defendant Cantu and the Board majority's candidates during elections. Furthermore, **LUIGI**'s name had not been mentioned before in the board meetings or workshops.  **LJISD** is in possession of every

evaluation for Mr. Mendoza, which have all been flawless.  He has not received any reprimands, write ups and has saved the District millions of dollars, while serving in this position.

89.    **LUIGI** did refuse to support **DEFENDANTS** as a candidate or support the candidates they proposed.  Although he stood his ground, **DEFENDANTS** did not like the employees he associated himself with, because their political connections were contrary to his own and his candidates.  Due to his refusal to switch sides and his continued associations with those he trusted, i.e. **PLAINTIFFS, DEFENDANTS** terminated **LUIGI'S** contract without notice, warning or any reason for said termination.   **LUIGI** and his family suffered irreparable harm in every way imaginable, but the financial crisis his family experienced, due to the loss of said salary, was the biggest burden.

### _Plaintiff David Nacianceno_

90.    Prior to being demoted on August 4, 2023, **DAVID** served as the Emergency Management Coordinator and performed the duties left to him when **DEFENDANTS** demoted **CESAR** from Crime Prevention Officer to Police Officer.   **CESAR'S** duties **DAVID** took over included the radio system for buses and all **LJISD'S** transportation, the management of **LJISD'S** security gates, the employees' staff cards and some other minor duties.  After **DEFENDANTS** demoted **CESAR** and left his position vacated, **LJISD** did not have anyone overseeing the bullying write-ups and investigations of crimes within the district.   **DAVID** oversaw **LJISD'S** raptor system, the purchasing of said equipment via the purchasing department, the background checks on individuals who show up on any campus and the connectivity to the district network.  Because the equipment for the new raptor system software was outdated and incompatible, **DAVID** had to physically get out to each campus, but needed permission from tech prior to doing so.  Once he was out of this position, again, **LJISD** did not have anyone performing these duties.

91.     When **DAVID** received the demotion letter in August, he was instructed to report to La Joya High School, where he was going to work as a teacher for the 2023-2024 academic year.  **DAVID** reached out to HR and informed HR he did not possess a teaching certificate.  He went to speak with **MAGDA** and **DAVID** recorded the conversation.  During the conversation, **MAGDA** stated "**DAVID** I don't know how else to tell you, but I am trying to help you out." **DAVID** responded, "MAGDA they are adamant to get me out."  **MAGDA** nodded her head 'yes' toward **DAVID**, affirming what he already sensed.  **DAVID** never received his teaching certificate or an emergency certificate, and therefore, sat in a class unable to be of any assistance to **LJISD.**

92.     **DAVID** was shocked when he was demoted, because neither his job position nor his name was ever mentioned at any of the Board meetings or workshops.  Like the other **PLAINTIFFS**, **DAVID** had a flawless record, while employed at **LJISD.**  His breadth of knowledge and expertise in his field is unparalleled to any other employee at **LJISD**. After his demotion, **DAVID'S** position was not filled.  **DEFENDANTS** left the district vulnerable and it became obvious that retaliation was more important than the safety of its employees and students to **DEFENDANTS**.

### *Plaintiff Lando Nacianceno*

93.     On June 29, 2023, **LANDO** was called to Human Resources (HR) and met with Magda Villarreal.  **MAGDA** was another one of **DEFENDANT'S** minions, who worked in the HR department.   She took over HR and did the dirty work after **DEFENDANTS** got rid of on-supporters, such as the employees who did not support **DEFENDANTS**, such as **PLAINTIFFS**.

94.     As soon as **LANDO** arrived to her office, he was informed he was being reassigned. When **MAGDA** opened up his personnel file she told him to forget about what she said and **LANDO** was "good for now."   **LANDO** left confused and of the ongoing retaliation by

**DEFENDANTS** against those who opposed them within **LJISD**. **LANDO** witnessed what **DEFENDANT BOARD MARJOITY TRUSTEE MEMBERS** did to anyone who did not a.) support them at their political events; b.) promise them political favors or paybacks; c.) promise their vote and support or d.) give them monetary donations for their campaigns (although the list, from what **LANDO** heard, was never-ending). **LANDO** never knew when his last day at **LJISD** was going to occur, but he was told by those close to **DEFENDANTS** to prepare for his non-renewal.

95.    **LJISD** was closed for the beginning of July and opened up July 17, 2023. That same day, while **LANDO** was making his normal rounds to the campuses and departments, Ludivina Scymoniak approached him. She told him she was the new director, instead of **LANDO**. **LANDO** was shocked and confused, and he explained to her he did not have a reassignment letter or any knowledge of being replaced by her or anyone at all. **LANDO** contacted HR and spoke with **MAGDA** again. She stated Ms. Scymoniak should not have shown up *yet.* Ms. Scymoniak did have a letter of reassignment, but **LANDO** did not.

96.    In early August, **MAGDA** called **LANDO** and told him to go to HR, and there, he was told he was being reassigned to the transportation department as the new Supervisor. He informed her that this new position would completely alter his contract, which had already been issued, and would make him an hourly employee. She checked the system and confirmed **LANDO** was right. **MAGDA** then told him she could not make that move she was ***being told*** to make. On September 6, 2023, **LANDO** was called in by **MAGDA** to go to HR again, and at that time, she gave him the official demotion.

97.    The first few weeks following his demotion, **LANDO** was told he could ***not*** leave his office and could ***not*** make the rounds at the schools to check in on them. He sat at his desk, in

an empty office, and was treated like a social pariah.  The new director, Ms. Scymoniak, did not even attempt to speak to him for a long time, despite the fact she was clueless on what to do. Eventually, **LANDO** was just given authority to make rounds at *two* (**2**) locations.  After make those two rounds, he was ordered to report back to his office immediately and sit there.

98.    **LANDO** had served as the Director of the Custodial Department without any complaints and was loved and respected by everyone he supervised.  His personnel file did neither contained any grievances against him nor complaints filed against him.  **LANDO** never received a write up from any supervisor or other individual at **LJISD.** His personnel file reflected his outstanding evaluations.  Throughout his tenure, **LANDO** was steadily promoted over the years since starting at **LJISD** in August, 2008.

99.    Despite earning a Bachelor's degree in History and a Master's Degree in public administration, since being employed by **LJISD,** and despite his experience and years of service to **LJISD**, **LANDO** was punished because he decided to invoke his Constitutional rights and not affiliate or vote the way he was being threatened to vote by **DEFENDANTS**.  Additionally, **LANDO** is a former commissioner for Palmview, which is an area deeply rooted and invested in by the Board Majority members, specifically the **ALEX** and **NEREIDA** and the whole Cantu family.  Knowing this, **LANDO** did not back down from running again, although he was warned not to do so via a third-party **ALEX** sent.   **LANDO** also did not succumb to the pressure to vote the way he was being told to vote by **DEFENDANTS**, despite the threats he received. **LANDO'S** choice to affiliate with candidates not aligned with **DEFENDANTS** and his decision ***not*** to support **DEFENDANTS** is what led to his demotion, which has left a permanent mark on his career.

***Plaintiff Jose Luis Perez***

100.    **JOSE LUIS** has been with **LJISD** since 1995, when he received his teaching certificate and began at Kike de la Garza in the **LJISD** school district. He eventually moved to J.D. Salinas Middle School, where he taught math, was the math chair and a migrant teacher. He was there for ten (10) years. In 2018 he received his master's in educational leadership and became the Migrant Director for **LJISD** in 2019.

101.    **JOSE LUIS** was a commissioner for the City of Palmview for over five (5) years. Elections for that position occur every four (4) years, and he had most recently been elected in 2022, prior to being demoted.

102.    **ALEX** has talked with both Plaintiffs **JOSE LUIS** and **RICARDO** about giving him the Municipal Judge position for Palmview, but neither elected officials engaged in this conversation. Even when threats were made against them by **ALEX**, they neither gave in nor entertained his corrupt behavior. Both have cited the charter for Palmview and how the municipal judge is selected. Given the fact **JOSE LUIS**' mother-in-law is a former District Judge in Hidalgo County and his brother-in-law has is an attorney in Hidalgo County as well, **JOSE LUIS**, knows the law and would never fall prey to tactics such as this.

103.    From 2018 until the summer of 2023, **ALEX** continually harassed **JOSE LUIS** to support him and his sister, **NEREIDA**, in their elections. **JOSE LUIS** felt he had no other option but to support them, but he did not support **ALEX**' entire political faction. Since **JOSE LUIS** won in 2018, **ALEX** told **JOSE LUIS** he was a disappointment, because **JOSE LUIS** had yet to make him a judge. **JOSE LUIS** kept reminding him he cannot do anything, as that decision is not up to him. On June 20, 2023, **JOSE LUIS** recorded a conversation between himself and **ALEX**. **ALEX** talked to **JOSE LUIS** about loyalty and accused **JOSE LUIS** of not being loyal to him. **ALEX** accused him of not communicating enough with him. **ALEX** explicitly told **JOSE LUIS**

he needed help and if **JOSE LUIS** helped him, **ALEX** would help **JOSE LUIS**.  **ALEX** told

**JOSE LUIS** he knows he is smart and knows what he is talking about.  **ALEX** then questioned

**JOSE LUIS** what he will get from him if he (**ALEX**) helps him (**JOSE LUIS**).  A week later, after

**JOSE LUIS** chose not to engage, again, in **ALEX'** corrupt, criminal behavior, he was reassigned

from his position as Director to Assistant Principal of a middle school

104.    **JOSE LUIS'** immediate supervisor, Mr. Munoz, gave **JOSE LUIS** a heads up and

told him "I wish I could keep you. You are doing an awesome job there.".  Mr. Munoz wanted

**JOSE LUIS**  to absorb another department, considering all of the political cuts being made.  This

would have given **JOSE LUIS** the oversight of parental involvement in the migrant program.

**JOSE LUIS** was stripped of this, due to political retaliation by **ALEX CANTU** and the other

Board Members and/or co-conspirators who took part in recommending his non-renewal.

105.    Unfortunately, prior to the 2023-2024 school year ending, Dr. Sorenson, the new

Superintendent, concocted a policy, which was adopted by the new board of trustees, which gave

an ultimatum to elected officials employed in an administrative position.  The elected official had

to choose between keeping their elected official position, in whatever role, *or* keeping his or her

job within the district in an administrative position.  This enacted policy is not within the real of

SBOT and has been found to be incredulous amongst the legal community and the general public.

This policy has ***not been adopted by any other District and deemed unconstitutional by many in***

***the legal community and amongst former board members in other districts***.

106.    **JOSE LUIS** was demoted from his position as Migrant Director to Assistant

Principal, and his days were changed from 226 to 207, without any justification given his

appraisals and the fact he was an administrator.  He oversaw 1.8 million dollars as the migrant

director, and was stripped of this and replaced with someone who had zero experience ***but***

supported the Defendant Board of Trustee's majority The principal job was given to Lori Longoria, who had far less experience and qualifications he had. At the very least, that job could have been given to him, but he was demoted even further down the line to assistant principal.

107.    At the end of the 2023-2024 school year, and after the new board was put in by TEA, Dr. Sorenson, along with the new board, enacted the new policy, as already said, and **JOSE LUIS** decided to resign from his position as Commissioner of Palmview. **JOSE LUIS** was an elected official serving as an assistant principal from 2023; yet this new policy required him to make a choice between his job at **LJISD** or being a Commissioner for the City of Palmview. Because **JOSE LUIS** had to take his kids and wife into consideration, he gave up his position as an elected official.

108.    It is important to note that during his tenure as a Commission for the City of Palmview, and prior to **DR. SORENSON, the current Superintendent of LJISD**, **JOSE LUIS** never had any issues separating his official duties as a Commissioner and serving and being employed at **LJISD** as the Director of Migrants. Additionally, he did not have any issues from 2023, when he was demoted to Assistant Principal. Prior to the new policy was enacted, **JOSE LUIS** always kept his integrity intact and fulfilled all obligations required of him in his official capacity.

*__Plaintiff Cesar Rodriguez__*

109.    Prior to being demoted, **CESAR** served as **LJISD'S** Crime Prevention Officer, making $78,000.00 a year. **CESAR** received a reassignment letter on February 15, 2023, from **Gloria Rodriguez,** one of **DEFENDANTS** supporters. He was demoted to serve as a Police Officer for **LJISD,** and his pay was reduced to $41,000.00 a year. Upon receiving this demotion,

**CESAR** called his Chief, and the Chief told him nothing was changing and he was going to continue serving in the same capacity, Crime Prevention Officer.

110.    For many months nothing changed for **CESAR**.  There was not another individual in **LJISD** who could perform the duties **CESAR** did, because he created the security system at **LJISD.  CESAR** oversaw all the security and this system he created utilized the electronic gates, which protected the campuses, and the creation of individualized security badges for each employee within **LJISD**.  Employees and Administrators within **LJISD** went to **CESAR** daily for the same tasks he performed before.  The Police Chief never told him of his new duties and did not even know of his demotion.  **DR. SAENZ** and eventually **H. GONZALEZ**, never met with him or discussed his new job responsibilities.  With this demotion, **LJISD** did not have any individual in charge of security, and it never posted for someone to fulfil this position.  **DAVID** had to take over **CESAR'S** job duties, but **DAVID** could not oversee both positions, and therefore, some of **CESAR'S** duties were left unattended, such as the oversight of bullying.

111.    Because of the gross reduction in pay, **CESAR** had no choice but to resign from **LJISD** and take another job as a Police Officer.  His pay is still significantly lower, and he is not able to utilize his expertise and training in his position, but he is making more than what he was making at **LJISD** after being demoted.

112.    Retaliation did not only result in his demotion, which diminished his job duties, salary, rank and title, but he was physically assaulted by **ANTHONY's** mother at a political event for the mayoral race in Peñitas election.  **CESAR** supported **RAMIRO,** who **DEFENDANTS** strongly disliked and who already suffered **DEFENDANT'S** retaliation.  Although pressured by numerous people aligned with **DEFENDANTS**, **CESAR** refused to support **DEFENDANTS,** and this is why **DEFENDANT BOARD OF TRUSTEE members** demoted **CESAR.**

*Plaintiff Joe Villarreal*

113.    **JOE** began working at **LJISD** in 2006 as a high school math teacher, and by 2008 he began working in the facilities department.  He has his bachelor's degree in mechanical engineering.  By 2010, **JOE** became the Assistant Director of Facilities in 2010-2011 and remained there for five (5) years.  Eventually **JOE** became the Director of Facilities and was there for two (2) years, until he was non-renewed on May 31, 2023.  **MAGDA** told **JOE** that **H. GONZALEZ** reviewed all of the positions, and **JOE**'s position was no longer needed, despite the fact **H. GONZALEZ** had only been on the job for a brief moment.  At that time, **JOE** was making $112,000.00.

114.    All of **JOE's** appraisals, at the end of each year, were phenomenal, and he saved **LJISD** a lot of money, due to his experience.  He was the most competent individual at **LJISD** for this job, prior to being terminated, and the employee put in his place by the Defendant **BOARD MEMBERS**, was only the "yes" man who was going to (and did) do their dirty work.

115.    When **ALEX** first ran against Armin Garza, **SALINAS**, Esmeralda Ochoa, **ALEX** and other Defendants met with both **JOE** and **LUIGI** would meet with friends of the board majority, specifically **ALEX** and **NEREYDA**'s husband, aka "Smiley", would meet to discuss a plan they had for **JOE** and **LUIGI**, *if* they helped them get certain individuals recommended for a position, which would ultimately go before them, so they achieve whatever corrupt act they wished to commit.  **ALEX** specifically told **LUIGI**, in front of **JOE**, he would promote him from assistant direct to director, *if* **LUIGI** did what **ALEX** and his cohorts requested.

116.    As he moved up the "ladder" into more powerful positions, **JOE** began to receive instructions directly from **ALEX** to put certain individuals in positions he or she was not qualified to possess.  **ALEX** told him to recommend certain individuals, so the Board majority could hire

their said individual, although this person was not qualified and did not possess the mandatory requisites for said position. Because of this, **ALEX** instructed **JOE** to change the job descriptions to accommodate the candidate **ALEX** wanted hired.

117.    Pursuant to Board policy, every recommendation had to go through the board, unless Defendant trustees circumvented this process. **JOE** took the recommendations forced upon him by **ALEX**, and **DR. SAENZ** knew these were not proper recommendations. She knew these recommendations were singlehandedly coming from the board majority and felt pressure to have the recommendations signed by herself and put on the agenda for the next board meeting.

118.    **JOE** felt threatened, because he knew **ALEX** was corrupt and doing things contrary to his position as Board President. Unfortunately, **JOE** felt obligated to do what was requested of him by **ALEX**, because he was afraid of losing his job and not being able to provide for his family.

119.    Around December 2023-January 2024, **DEFENDANTS** no longer turned to **JOE** to do their dirty work, because **JOE** told them he was not going to make "the moves" they wanted, because he knew it was not in the best interest for **LJISD**.

120.    **JOE** has stood by the other Plaintiffs, on his own accord, supporting the candidates running against **DEFENDANTS** and/or *not* supporting **DEFENDANTS**.

121.    Interim Superintendent for **LJISD**, **H. GONZALEZ**, signed a letter for non-renewal of **JOE's** contract for the 2023-2024 school year on May 31, 2023, a week prior to the year ending.

122.    **JOE's** name had never been mentioned in any of the school board meetings, was not part of any budget cut, and has had phenomenal evaluations each year. Additionally, he has not received any reprimands, write ups *and* has saved **LJISD** millions of dollars while serving in his position.

123.    Since being non-renewed, and despite the fact JOE has applied for *many* different jobs throughout Hidalgo County, he has only had a handful of interviews and zero offers.

### *Plaintiff Ricardo Villarreal*

124.    **RICARDO** has been a long time employee of **LJISD** and over time, moved up the ranks to Assistant Superintendent of Operations.    This was the position he held, prior **DEFENDANTS** retaliating against him and demoting him to Assistant Principal.    **RICARDO** filed a numerous grievances, and at his Level III grievance, he informed **DEFENDANTS** and all of **BOARD MEMBERS** he had been meeting with the FBI and had reported **DEFENDANTS** corrupt actions and inactions.    **RICARDO** was nonrenewed not long after he informed **DEFENDANTS** of this.  He currently is unemployed.

125.    On or about August 2020 Superintendent **DR. SAENZ** approached **RICARDO** and told him she might not be the Superintendent much longer, because she had cut the Read and Feed after school supper program.  This program was partially operated and owned by **LJISD** board member **ALEX'** wife, Vicky Cantu.    **RICARDO** was in charge of the Child Nutrition Program at this time, and therefore, was made aware of these issues.

126.    In May 2021, **RICARDO** contacted the Federal Bureau of Investigation (hereinafter **"FBI"**) and the Untied States Department of Agriculture, ("hereinafter USDA").  **RICARDO** informed Superintendent **DR. SAENZ** the FBI was coming to **LJISD** to retrieve documents, regarding this program.  Both **DR. SAENZ** and the Chief of Police were already aware FBI was coming, because they were told to gather certain documents in preparation to hand over said documents to the federal agents, upon their arrival.  When the FBI agents arrived at **LJISD**, **DR. SAENZ**, was no longer on **LJISD'S** premises.

127.    **RICARDO** spoke with **DR. SAENZ** on April 25, 2022, regarding the upcoming election for Mayor of Palmview, a position he held at that time.  **RICARDO** was very clear that

he feared retaliation against him and his job status within **LJISD**. **RICARDO** told her that both **ALEX** and **NEREIDA** politically opposed him in the mayoral race. **DR. SAENZ** was apprehensive in responding, but she did tell **RICARDO** just to keep doing his job.

128.    At a February 2022 board meeting, **ALEX** approached **RICARDO** and asked him to appoint him as municipal judge in Palmview. **RICARDO** responded he could not and would not do such a thing. **ALEX** responded, "help me and I will help you." Later that day, **RICARDO** received a phone call from Commissioner, Plaintiff **JOSE LUIS** told **RICARDO** that **ALEX** asked him to appoint him as a municipal judge.

129.    On June 14, 2022 **DEFENDANT LJISD SCHOOL BOARD MEMBER ANTHONY**, asked **RICARDO** to support his election campaign. He also asked **RICARDO** to award him a position on one of Palmview's committees, and pointed out the obvious, that because **RICARDO** is the Mayor of Palmview, he could do this on his own accord. **RICARDO** refused to commit his allegiance to **ANTHONY** and did not pledge his support to either request.

130.    **ANTHONY** approached **RICARDO** again, on August 1, 2022, asking for his support for the upcoming November 2022 elections. **RICARDO** told **ANTHONY**, again, he was unable to commit and pledge this promise.

131.    On October 13, 2022, at a city of Palmview function, **ANTHONY** approached **RICARDO** and threatened him by stating "If [he] win[s] for the school board, [he is] going to get [**RICARDO**] out of [**RICARDO'S**] current position at **LJISD** and if [he] can get [**RICARDO**] fired, [he] will." **RICARDO** disclosed these threats by **ANTHONY** to **JOSE LUIS** and Raul Gonzales on October 17, 2022. Both **JOSE LUIS** and Mr. Gonzales told **RICARDO** they, too, are in fear of losing their jobs at **LJISD** and believed they were in jeopardy, for the same threats from **ANTHONY** that **RICARDO** suffered.

132.    Again, on October 19, 2022, **ANTHONY** asked **RICARDO** to endorse him for the school board election. **RICARDO** told him he chose not to endorse anyone in that race, although he only said this, out of fear he would lose his job, considering **ANTHONY** was part of the Board majority.

133.    By November 7, 2022, Alexia Solis approached **RICARDO**, warning him that he needed to "be ready because changes were coming." She continued to explain that "changes were coming" and **RICARDO** and his wife will be affected due to this election.

134.    Raul Gonzales asked **RICARDO** on November 15, 2022 if he was aware that **LJISD** reassigned him. **RICARDO** told him he was not and this caused **RICARDO** to worry more, because he knew Mr. Gonzalez also did not support **DEFENDANT TRUSTEE MEMBERS,** such as **ANTHONY**.

135.    The week of November 14, 2022, **DR. SAENZ** called **RICARDO** on his phone and informed him that three (3) employees in **RICARDO's** department, **RAMIRO**, Clarissa Marez and Franco Lopez, were all being reassigned to different positions. **RICARDO** was unaware as to what led to these reassignments, and nothing was shown to **RICARDO** when he questioned **DR. SAENZ** regarding these moves. **RICARDO** has firsthand knowledge that these three (3) employees, such as himself, did not support the school board majority, **DEFENDANTS ALEX**, the school board president, his sister-in-law, **NEREIDA**, the school board secretary and **ANTHONY**, the vice president, upon his election that fall ( the same election **RICARDO**).

136.    On November 21, 2022, Rolando Cantu and Joel Benavides called **RICARDO** and inquired if he had been reassigned yet. This alarmed and surprised **RICARDO** but he was panicking more because he knew he was going to be the victim of **DEFENDANTS** retaliation. Not soon after they told him this, **DR. SAENZ** called **RICARDO** on December 5, 2022, and told

him to meet with **ALEX** at La Joya High School. At this meeting, **ALEX** told **RICARDO** that "[the board] [was] going to hire an attorney to investigate all of the PSI projects and all of the HVAC ESSER projects." **RICARDO** perceived this as a threat, because his department leaders and he follow the procurement process with all ESSER projects, and he knew **YVONNE** had already been harassed by an attorney **DEFENDANTS** hired to go after her for the same thing. Again, anyone in opposition to **DEFENDANTS**, specifically the Board majority, were going to go out of their way to retaliate **PLAINTIFFS** and other unfortunate individuals who did not support them.

137.    On January 4, 2022, **DR. SAENZ** called **RICARDO** to her office to discuss his current position with **LJISD.** The meeting lasted approximately thirty-five (35) minutes and ten (10) after leaving the meeting, **DR. SAENZ** called **RICARDO**, requesting him to immediately return to talk with her again. **RICARDO** returned to meet with **DR. SAENZ** and she handed him a reassignment letter. **DR. SAENZ** told him "[he] [had] done a good job in [his] department, however; in the best interest of the district, [she] need[ed] someone who [could] do more." **DR. SAENZ** demoted **RICARDO**, despite his excellent evaluations and the fact he was never informed of any deficiencies or malfeasance within his department.

138.    **RICARDO** was replaced by Jose Garcia (aka Pepe), a Middle School Principal, who had significantly less experience in management and did not possess the requisites to hold the position as Assistant Superintendent.    Pepe and his wife publicly supported **NEREIDA, ANTHONY** and the rest of the **BOARD MAJORITY** when they ran for election.    He helped their campaigns immensely, and was willing to do anything asked of him, and in return, he was promoted, while **RICARDO** was demoted.    **RICARDO** confirmed his suspicions on January 5, 2023, when Alexia Solis told **RICARDO** that after she found out he was demoted, she spoke to

**ALEX**. **ALEX** told her that he and the Board majority, **DEFENDANTS NEREIDA, ALDA AND ANTHONY** were doing what was in the best interest for the district by demoting **RICARDO** and they (**DEFENDANTS, ALEX, NEREIDA, ALMA AND ANTHONY**) were conspiring to move **RICARDO** again, in the near future. **RICARDO** heard an audio recording on January 13, 2023, in which an employee of **LJISD** commented "I knew they were going to move Ricardo Villarreal." That same day, Mague Requenez told **RICARDO** that **ANTHONY** told him that he retaliated against **RICARDO** for "what had been done to [Mr. Euresti's] mother and because **RICARDO** did not support him in the election. **ANTHONY** further he stated he didn't care about **RICARDO** being demoted, and he actively conspired and retaliated against him with others. On January 16, 2023, David Garza approached **RICARDO** and warned him that more changes were coming and to be prepared. **RICARDO** forewarned any and all individuals he knew who did not support **DEFENDANT'S** themselves or their candidates.

139.    Once **PEPE** overtook **RICARDO's** position as Assistant Superintendent of Operations, **PEPE** put a lot of pressure on employees, which **RICARDO** and **JOSE LUIS** witnessed. He ordered individuals to falsely write up and fire people who did not support his side. **PEPE** told these employees he was receiving his orders from the new Superintendent, Heriberto Gonzalez, who took over once **DR. SAENZ** resigned. **PEPE** went on to tell these employees, in the presence of **RICARDO and JOSE LUIS** that these orders were coming from **DEFENDANT LJISD BOARD OF TRUSTEE MEMBERS,** specifically **ALEX.**

**Defendant's LJISD Board Majority Trustee Members make political cuts to non-supporters of their faction**

140.    As mentioned throughout this complaint, those individuals at **LJISD** who did not support **DEFENDANT'S BOARD OF TRUSTEE MEMBER'S** agenda, candidate or whatever

**DEFENDANTS** asked, suffered retaliation. Plaintiffs refused to support **DEFENDANTS**, and thus, were targeted and suffered the consequences.

141.    Each Plaintiff was pressured directly by Defendant Board member **ALEX** and/or an employee or third (3rd) party he would send to Plaintiffs, at individual times.  The pressure came from **ALEX**' wife, **NEREIDA**, **ESMERALDA** and **ANTHONY** and/or a third (3rd) party they sent to Plaintiffs.  These Defendants intentionally sent individuals to capture photographs of Plaintiffs and **LJISD** employees at their events or their candidates' events and had 'spies', who would take photographs of **LJISD** employees, supporting **DEFENDANT'S** opposition or the candidate **DEFENDANTS** did not want.

142.    One event, as mentioned above, was the highly contentious and suspenseful election for the Mayor of Peñitas, which Plaintiff **RAMIRO** held as the incumbent. **DEFENDANTS** waged war against Plaintiffs for not physically aiding their candidate's election ***and*** for not physically being on their "side" during the return of the results.  As noted before, the Loya family, which is comprised of Plaintiffs **RAMIRO**, **AYDEE**, **LLOYD** and **YVONNE**, were **DEFENDANTS'** targets and each suffered severe retaliation.

143.    **RAMIRO** was demoted from a prestigious position he held for many years and had the love, respect and flawless record to continue in said position to a janitor position at the stables. This demotion led to **RAMIRO**'s resignation, because he suffered severe injuries to his back from the rigorous work **DEFENDANTS** made him do.

144.    **LLOYD** was non-renewed without any notice, justification or reason and was replaced by someone who did not possess any knowledge, experience, degree or interest in the position **LLOYD** held for so many years.  Due to being blackballed, **LLOYD** was unable to find employment until **AYDEE** was intentionally retaliated against by **DEFENDANTs,** when she was

removed from her students and school campus, situated near her home and children, and sent her to a campus in a remote area. This campus, in the rural area of Hidalgo County, took **AYDEE** between 20-40 minutes extra to and from, which created chaos in attending to her children and family. This demotion affected her pay the following year and resulted in a reduction. Her unwarranted demotion was unnecessary and done as a deliberate, retaliatory, overt action by **DEFENDANTS**, due to her affiliation and support of her father-in-law, **RAMIRO**.

145.    **YVONNE** tried to stay under the radar as much as possible and did not involve herself in politics, because she loved her job and was on the track to become Superintendent within Texas at some point. **YVONNE** devoted her time and effort in "climbing up the ladder" within **LJISD,** but her determination and hard work were meritless.    **YVONNE** was also demoted to a position she held near the beginning of her longstanding career.

146.    **CESAR,** who outwardly did not support **DEFENDANTS** as candidates or the candidates **DEFEDANTS** supported.  For the Peñitas mayoral election, **CESAR** supported **RAMIRO**.  During this event both factions were on opposite sides with their respective candidate, but **DEFENDANTS** continuously sent over individuals in their "camp" to target and harass **PLAINTIFFS. CESAR,** who was merely a bystander away from any tent, was physically assaulted by **ANTHONY's** mother.  **CESAR** suffered physical injuries to his face and back, and eventually **ANTHONY'S** mother was arrested for said assault.  **DEFENDANTS** hired an attorney, who represents the District in its "investigations", specifically those against **PLAINTIFFS**.

147.    Each Plaintiff was either non-renewed, demoted and eventually non-renewed, forced to resign or terminated.  **DEFENDANTS,** both the old and new regime, replaced each position, formerly held by **PLAINTIFFS** with individuals who were highly unqualified. Magda Villarreal, a former employee of **LJISD,** posted **LLOYD'S** position as an available position,

*during his Level III grievance before the Board, while he and Counsel were sitting in the same room awaiting his turn to air his grievance.* **DEFENDANTS** knew moving these individuals was not ethical, legal or the best things for **LJISD,** but **DEFENDNANTS** all acted together to violate **PLAINTIFFS'** constitutional rights, which caused irreparable harm.

<u>**Texas Education Agency Special Investigation Report**</u>

148.    On or about March 21, 2022, the Commissioner of Education authorized a special investigation task force, within the Texas Education Agency, (hereinafter "TEA"), to conduct an investigation against LJISD and its Board of Trustee Members.   This investigation was unavoidable based on allegations of malfeasance of public funds, corruption, abuse of official capacity, retaliation, the arrests and convictions of prior LJISD Board of Trustee members and other similarly related allegations.

149.    Despite the fact **LJISD** dispute the following findings, TEA, through its extensive investigation, made the following findings against **LJISD**:

150.    TEA sustains that the findings and evidence support that the Board violated Tex.Educ. Code §11.051 and §11.1511.  Tex. Educ. Code §11.051(a) states that school districts are governed by a board of *trustees* who owe fiduciary duties to the school district (beneficiary).  Each **LJISD** trustee is bound by the legal implications of trusteeship, which includes the fiduciary duties of good faith, prudent investing, and compliance with law and policy.  *See Exhibit A, TEA final report.*

**VI. CAUSES OF ACTION**

<u>**COUNT I:  SECTION 1983 Adverse Employment Decision**
**upon Plaintiffs' Exercise of their First Amendment Rights**</u>

151.    PLAINTIFFS incorporate by reference all factual allegations stated in this pleading as though fully set forth at length herein and assert that the same are moving factors which have resulted in the violations of their Constitutional protections.

152.    The Civil Rights Act, codified as 42 U.S.C. § 1983, provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any laws, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

153.    At all times, Defendants were acting "under color of state law," and intentionally deprived Plaintiffs of their rights under the Constitution of the Untied States.

154.    In order for Plaintiffs to establish a claim for retaliation based on the exercise of their First Amendment rights, each Plaintiff herein must prove the following four elements, (1) that she suffered an adverse employment action; (2) that she spoke as a private citizen (as opposed to a public employee) on a matter of public concern; (3) that her interest in the speech outweighed the government's interest in the efficient provision of public services; and (4) that her speech precipitated the adverse employment action. See *Modica v. Taylor*, 465 F.3d 174, 179-80 (5th Cir. 2006).

155.    Specifically, Plaintiffs complain that while the Defendants were acting under color of authority of the State of Texas as members of the LJISD School Board, they intentionally violated Plaintiffs constitutional rights.  Plaintiffs claim that LJISD intentionally and knowingly non-renewed Plaintiffs, failed to promote and demoted Plaintiffs, because of their exercise of the right of free speech.  Therefore, Defendant deprived Plaintiffs of their rights under the First Amendment of the Constitution.

156.     The First Amendment of the Constitution of the United States gives every citizen the right to freedom of speech, which includes the right for each Plaintiff of this lawsuit, to participate and speak freely as to which candidate the said individual supports, without suffering the consequences at LJISD.  Each Plaintiff has the right to attend political evens, without being harassed, retaliated against **or** accosted by one of the Defendants, if not all, or one of the Defendant's family member, friend or political ally.

157.     A person may sue for an award of money damages against anyone who, "under color" of any State law or custom, intentionally violates the plaintiff's rights under the Constitution of the United States.

158.     Plaintiffs claim that Defendants, while acting under color of state law, intentionally deprived them of rights under the Constitution of the United Sates via customary pattern and practice, via overt inaction and overt actions taken against Plaintiffs.

### COUNT II: 42 U.S.C. §1983 and §1988: Substantive and Procedural Violations of Fourteenth Amendment Due Process

159.     **PLAINTIFFS** incorporate by reference all factual allegations stated in this pleading as though fully set forth at length herein and assert that the same are moving factors which have resulted in the violations of **PLAINTIFFS'** Constitutional protections.

160.     Defendants **LJISD's** majority Board of Trustee members had knowledge and endorsed or rubber-stamped the demotions, non-renewals, terminations and the undeserved promotions given to other the employees who supported Defendants' political agendas.  These employees who were promoted did not come close to meeting the requisites for these positions, once held by Plaintiffs.  These positions were never posted, and interviews were never conducted. **LJISD** simply retaliated against Plaintiffs and promoted the puppets who did what they wanted to self-serve their needs.

161.    **DR. SAENZ** became so fed up with rubber stamping the recommendations to demote and non-renew employees she *knew* did not deserve such maltreatment, that she eventually resigned.  Rather than play Defendant's dirty game and corrupt malfeasances, Dr. Sanez left the District, because she could not continue to do their dirty work.  She now works for Region One, and Plaintiffs believe she will speak the truth and reveal everything she was forced to do, based upon conversations she has had with certain Plaintiffs.

162.    Defendants intentionally and knowingly brought in **GONZALEZ** because he is a rubber stamper and thrives upon any power he can possess.  **GONZALEZ** was forced to leave Brownsville Independent School District ("**BISD**") in Cameron County after the slew of lawsuits incriminating him with the other conspirators.  Not to long after, **GONZALEZ** fled another district due to the same actions (inactions).  **LJISD** decided to hire him as Interim Superintendent, knowing he had a $2,000,000 lawsuit pending against him for driving a governmental car (of the school district who employed him) and crashing the vehicle.  Nobody would hire **GONZALEZ** given his history and pending charges, but **LJISD** hired him *and* approved him to receive a contract as the Superintendent of **LJISD**, rather Interim Superintendent.  The former board gave him a bountiful raise, and this all occurred prior to TEA taking over the District and removing him.

163.    For the short time **GONZALEZ** was in office, he did everything the Defendant Board Majority required of him.  Contracts were given out to friends and family, friends and supporters/ political allies were promoted, and Plaintiffs continued to suffer the retaliation of **LJISD** for not supporting **DEFENDANT'S** political agenda.

164.    **LJISD** even hired **GONZALEZ'** business partner, with who he has a construction company, and who has received contracts for jobs from **LJISD**, but **DEFENDANTS t**urned a blind eye to this.  **GONZALEZ** *never applied for this job because it was not properly posted.*  A

Plaintiff, with firsthand knowledge, will testify that **GONZALEZ** *never* submitted an application. This Plaintiff will testify that the job posting done for "show" was not done properly by law. Defendants knew exactly who they needed to be Superintendent to do their dirty work, and that is exactly what he did prior to being ran off by TEA.

165.    Defendants' actions individually and collectively, deprive the Plaintiffs of their constitutionally protected rights.    **DEFENDANTS**' actions were arbitrary, capricious, or conscience shocking as evidenced in this petition.  Defendants' actions were not rationally related to a legitimate governmental interest.  Additionally, Defendants' actions failed to provide Plaintiff with adequate procedural safeguard to vindicate their protected interests.

166.    As a result of Defendants' conduct, Plaintiffs were injured as stated herein.

<u>**COUNT III: 42 U.S.C. §1983 and §1988: Violation of**</u>
<u>**Fourteenth Amendment Due Process Failure to Supervise and Train**</u>

167.    Plaintiffs incorporate by reference all factual allegations stated in this pleading as though fully set forth at length herein and assert that the same are moving factors which have resulted in the violations of Plaintiff's Constitutional protections.

168.    **LJISD's** Board of Trustees is responsible in supervising and/or training the Superintendent, Defendant **DR. SAENZ** and **H. GONZALEZ**, ensuring she/he are doing their job and making sure every employee has received the appropriate training.  It is their duty to make sure the Federal Laws surrounding the education code and its employees are being strictly adhered to.  **DEFENDANTS** *did not* do that.  **LJISD's BOARD OF TRUSTEES** completely dropped the ball in supervising Superintendent **DR. SAENZ** and Interim/Superintendent **H. GONZALEZ** and overseeing the district.  **DEFENDANTS** deprived Plaintiffs' of their  professional livelihoods and their ability to serve in the positions they were rightfully elected to serve.  **DEFENDANTS** harmed Plaintiffs both physically, emotionally, and monetarily and all of their actions affected their

families as well.  Defendants did not give any credence to Plaintiffs future, because their own political agenda was more important.

169.    **DEFENDANT BOARD OF TRUSTEE MEMBERS** should have put a stop to all of the demotions, terminations and retaliatory acts, ***if they truly were not involved in said acts.*** They were aware of the continual complaints brought forth by former and current employees, regarding **DEFENDANTS** abuse of power and violations of state law.  **DEFENDANTS** cannot deny they were "in the dark" as to these excessive employment shifts occurring daily, because they, or a third party they sent, directly told **PLAINTIFFS** to "watch out", "be prepared", "their time at **LJISD** is coming to an end" and other countless comments, causing trepidation in **PLAINTIFFS** each day they went to work.

170.    **DEFENDANT BOARD OF TRUSTEE MEMBERS** should have met with  **DR. SAENZ** or **H. GONZALEZ** and all of the administrators at **LJISD** to address their actions, inactions and harm they were causing to Plaintiffs and other employees and the harm to **LJISD**. It was **DEFENDANT BOARD OF TRUSTEE MEMBER'S** duty and responsibility, pursuant to well settled law, to ***strictly supervise, manage and oversee the District***.  Defendants did not adhere to this.

171.    Defendants did not even cooperate fully or agree to step down when TEA was announcing to the entire State of Texas that there was no escaping the blatant, unfathomable corrupt behavior committed by the Board.   They turned a blind eye and focused on other matters more important to them, which was political retaliation and destruction.

172.    As a result of the lack of guidance, supervision and training by LJISD's BOARD OF TRUSTEES, the Superintendent, the Human Resources and other Administrators and political supporters of the Board, consciously disregarded the law and violated Plaintiffs constitutional

rights. LJISD Board members consciously disregarded the risk to the District and the funding for the District, all because of their selfish political agenda's and retaliatory ways.  Even after being confronted by the TEA investigator, LJISD disregarded the predictable and foreseeable fact that malfeasance and corruption was continuing in the District, but specifically against Plaintiffs.

173.    At the end, prior to Defendants being removed as Board members and Superintendent, almost all the thirteen (13) Plaintiffs were either non-renewed or forced to resign. After their removal the few remaining were forced to resign, and only a couple remain, but in their demoted capacity.

### COUNT IV: 42 U.S.C. §1983 Violation of 14TH Amendment Due Process

174.    Plaintiffs incorporate by reference all factual allegations stated in this pleading as though fully set forth at length herein and assert that the same are moving factors which have resulted in the violations of Plaintiff's Constitutional protections.

175.    The Civil Rights Act, codified as 42 U.S.C. § 1983, provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any laws, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

176.    During all times and on the occasions described above and herein, all individuals involved directly or indirectly for LJISD were in their official capacities, were acting under color of the law and regulations of the LJISD and the State of Texas.

177.    Plaintiffs' 14th Amendment rights were violated in that Plaintiffs have a liberty interest in furthering Plaintiffs' careers in their desired field, obtaining steady, gainful income and

being provided with a proper hiring process in order to obtain and maintain a position offered by the **DEFENDANTS**.

178.    **DEFENDANTS** have a pattern and practice of violating its procedures already in place and/or creating new unwritten policy, in order to manipulate the hiring process or transfers within **LJISD** for sought after positions.  This customary practice and pattern always benefit those who politically support the Board Majority and its Superintendent, i.e. Defendant Board of Trustee Members and each Superintendent who comes and goes with the wave a hand by the Board.  This corrupt, customary practice and deeply rooted pattern provide **DEFENDANTS** subordinates with a safety net in furthering their career, their bank and their health.

179.    **DEFENDANT BOARD OF TRUSTEE MEMBERS** are responsible for municipal policies relating to the hiring, terminating, training, supervision, demotion, transfer, payment and discipline of its employees, and allowed this widespread practice to continue and benefit the political underlings of **DEFENDANTS**.

180.    **LJISD** was previously put on notice of such illegal practices, in their custom and pattern of practice in at least one prior suit.  This, coupled with the **DEFENDANT BOARD OF TRUSTEES** *failure to train* and *failure to supervise*, as to stopping and prohibiting this widespread illegal practices still ongoing, illustrate to Plaintiffs that **DEFENDANTS** tolerate and acquiescence's federal right violations.

**COUNT IV:  CIVIL CONSPIRACY**

181.    Plaintiffs incorporate by reference all factual allegations stated in this pleading as though fully set forth at length herein and asserts that the same are moving factors which have resulted in, and/or been a moving force or producing cause of said violations in this pleading.

182.    **DEFENDANT LJISD** is further liable for civil conspiracy.  A civil conspiracy is a combination by two or more persons whose goal is to accomplish an unlawful purpose or a lawful purpose by unlawful means. *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996).  Plaintiffs have plead sufficient facts to show that (1) two or more persons; (2) with an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) committed one or more unlawful, overt acts; (5) that proximately resulted in damages.  See *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005); *Boales v. Brighton Builders, Inc*., 29 S.W.3d 159, 164 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).    The acts and inferences drawn from acts of **DEFENDANTS** and its policymakers, as described hereinabove, satisfy each of the evidentiary requirements of law to hold **DEFENDANTS** liable for this cause of action.

## VI. RATIFICATION

183.    Whenever in this complaint it is alleged that LJISD did any act or thing, it is meant that LJISD's officers, agents, servants, employees or representatives did such act and/or that at that time such act was done, it was done with the full authorization or ratification of **LJISD** or was done in the normal and routine course and scope of **LJISD's** officers, agents, servants, employees, or representatives. **LJISD** and its trustees effectively "rubber-stamped" the actions of its officers, agents, administrators and employees. Such is the custom and practice of **LJISD**.

## VII. DAMAGES

184.    **PLAINTIFFS** sustained the damages as a result of the actions and/or omissions of LJISD and are entitled to recover the following elements of damages to the fullest extent allowed by law.

a.    **PLAINTIFFS** suffered mental anguish and emotional distress

b.    **PLAINTIFFS** suffered physical illness in the form of lack of sleep, depression, weight gain, weight loss, hair loss and inability to focus.

c.    Liquidated damages

d.    Compensatory damages

e.    **PLAINTIFFS** are entitled to post-judgment interest on all sums, including attorney fees and costs awarded in this suit;

g.    Expert fees as the Court deems appropriate;

h.    Prejudgment interest;

i.    All reasonable and necessary costs incurred by or on behalf of **PLAINTIFFS** and

j.    Attorney's fees, costs and expenses.

## VIII. DEMAND FOR JURY TRIAL

185.    In the above styled and numbered cause, **PLAINTIFFS** demand a jury trial.

## IX.  PRAYER

**WHEREFORE, PREMISES CONSIDERED, PLAINTIFFS** respectfully pray that **LFCISD** be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for **PLAINTIFFS** against **LJISD** for damages in an amount within the jurisdictional limits of the Court; exemplary damages, together with interest as allowed by law; costs of court; and such other and further relief to which **PLAINTIFFS** may be entitled at law or in equity.


Respectfully submitted,

**MARTINEZ & TIJERINA P.L.L.C**

1201 E. Van Buren
Brownsville, Texas 78520
Ph. (956) 550-4868
Fax (956) 621-0135

*/s/ Tomas F. Tijerina*
Tomas F. Tijerina
Federal ID No. 1062166
State Bar No. 24070746
ttijerina@mbmtlawfirm.com

Benigno (Trey) Martinez
Federal ID No. 23945
State Bar No. 00797011
trey@mbmtlawfirm.com

**AND**

**LAW OFFICE OF ROBERT GUERRA, PLLC**
1201 E. Van Buren St.,
Brownsville, Texas 78520
Ph. (956) 254-0694
Robert Guerra
Federal ID No. 570991
State Bar No. 24036694
rguerra@rguerralaw.com

**AND**

**LAW OFFICE OF STAR JONES**

By:    /s/ *Star Jones*
State Bar No. 24062810
Federal ID No. 964890
P.O. Box 1179
Olmito, Texas 78575
Telephone:    (956) 371-0061
lawofficeofstarjones@gmail.com
**ATTORNEYS FOR PLAINTIFFS**